GARY M. RESTAINO
United States Attorney
District of Arizona
MATTHEW C. CASSELL
Assistant U.S. Attorney
Colorado State Bar No. 38157
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: Matthew.Cassell@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Julian Canastillo,<br>Defendant. | CR 22-1857-TUC-JCH-BGM<br><br>GOVERNMENT'S ADDENDUM TO MOTION FOR REVIEW OF MAGISTRATE JUDGE'S RELEASE ORDER<br><br>(Pursuant to 18 U.S.C. § 3145(a)) |

The United States of America, by and through its undersigned attorneys, pursuant to 18 U.S.C. § 3145(a) moves this Court to review the June 6, 2023 Order of U.S. Magistrate Judge Bruce G. Macdonald, releasing the defendant on a personal recognizance bond. The government requests that the defendant be detained pending trial. In support of this motion, the government states as follows:

A. Facts

This case originated from an investigation conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). ATF agents learned of multiple sales reports that showed Cody Joiner bought 76 firearms, many of which were the same make, model, and caliber, from the same firearms dealer on five occasions between December 28, 2021, and February 7, 2022. Agents spoke with Joiner and Roy Glen Cline III (Joiner's roommate who told agents he was involved with Joiner in the purchases), and both admitted to repetitive purchases of the same types of firearms and selling or trading the purchased

firearms. Records from the same dealer showed that Cline purchased 57 firearms, many of which were the same make, model, and caliber, between October 29, 2021, and January 20, 2022. It should be noted that at least 16 of the firearms purchased by Joiner and Cline were recovered in a Mexican police seizure of 188 weapons in Navajoa, Sonora, Mexico. Also, one other firearm purchased by Joiner was recovered in Oaxaca, Mexico, on August 10, 2022.

Agents then re-interviewed Joiner and Cline, who admitted that they bought firearms for Timothy Scott Waltermire, Jr., beginning in October 2021. Cline also stated that he referred friends who were interesting in straw purchasing to Waltermire. Agents believe Waltermire knew the firearms Joiner and Cline were purchasing were to be sent to Mexico. Dealer records showed that Waltermire purchased nine firearms between March 24, 2019, and December 1, 2021, and financial records showed Waltermire made several large cash deposits from November 2021 to February 2022. Agents served a search warrant on Waltermire's house and found firearm bills of sale, currency in the amount of $7,885, and 16 firearms. Agents eventually interviewed Waltermire, who stated said that he was buying and building AR-style and AK-style rifles for a coworker, later identified as the defendant, Julian Canastillo. Waltermire told agents he would usually purchase two or three firearms at a time, but sometimes up to 13. He estimated he acquired 50-60 firearms for the defendant, and financial analysis indicated that between May 2021 and April 2022, Waltermire made cash deposits of a total of $73,000 from an unknown source, and these deposits mirrored the amount he spent on firearms on a month-to-month basis.

A separate investigation revealed Omar Trujillo, Jr., and Carlos Martinez purchased 12 and two respective firearms between January 24 and April 28, 2022, many of them having the same make, model and caliber. One of these firearms was recovered in Apodaca, Nuevo Leon, Mexico, on May 12, 2022. Martinez reported no income in 2021-2022, while Trujillo reported no income in 2022 and less than $7,000 in income in 2021. Martinez then straw purchased a .308 caliber rifle on April 30, 2022. After completion of the purchase, agents contacted Martinez and learned he was purchasing this firearm, along with two

others on April 28, 2023, for Trujillo. Martinez told agents he believed the firearms could be headed to Mexico. Similarly, between December 28, 2021 and April 11, 2022, Nicolas Meraz straw purchased ten firearms from dealers in the area for Trujillo.

On June 2, 2022, ATF agents learned from the Pima County Probation Department that during a compliance check of the defendant, who was on probation for a prior felony robbery conviction, a probation officer saw several photographs of firearms on the defendant's phone. Agents seized the defendant's cell phone and found text conversations on the phone that corroborated Waltermire's admissions that he was purchasing firearms for the defendant, as well as messages in which he tells Trujillo to acquire firearms for him. These conversations match the dates of known firearm purchases by Trujillo. The defendant's cell phone also revealed text messages with Meraz, where the defendant tells Meraz to straw purchase firearms for him. The dates of these text conversations match Meraz's firearm purchases. The defendant's phone also revealed text and WhatsApp conversations dated March through May 2022, with Corey Creasia. In these conversations they discuss Creasia straw purchasing firearms and high-capacity drum magazines for the defendant. Agents obtained the firearm order invoices and Forms 4473 for Creasia's purchases, which matched the dates and descriptions in the conversations with the defendant. Creasia told agents he met the defendant through Armslist.com and that the defendant asked Creasia to obtain firearms for him. Creasia said he made $500 to buy a Barrett .50 caliber rifle for the defendant and showed agents documentation of Zelle payments for the firearm purchases, which he received from an individual he believed to be the defendant's mother. Finally, the defendant's phone revealed WhatsApp conversations dated April 30, 2022, with Diego Gonzalez. These conversations appeared to document the sale and transfer of two firearms from Gonzalez to the defendant for $3,250, as well as the defendant's interest in buying additional firearms from Gonzalez. Gonzalez admitted to agents he straw purchased two rifles on April 30, 2022, and sold both to the defendant the same day.

Ten defendants (the defendant and the eight co-conspirators mentioned above) have

been indicted for their roles in this case. Four have entered pleas of guilty, while four others, including the defendant, are set for trial. Two have active arrest warrants based on the indictment and have yet to make their initial appearances in this case.

B. Procedural Background

On October 26, 2022, the defendant made his initial appearance before U.S. Magistrate Judge Lynnette C. Kimmins, who ordered the defendant detained pending trial after the defendant submitted on the issue of detention. On May 8, 2023, the defendant moved for his release. On June 6, 2023, Magistrate Judge Macdonald ordered the defendant released to a third-party custodian, his brother Solomon, on a personal recognizance bond. On the same day, the government filed a motion to review and requested a stay of release with the District Court. The Court granted the stay and ordered the government to supplement its request for review by June 9, 2023.

C. Law

The Ninth Circuit has described the factors a court is to consider in determining whether a defendant should be released on conditions or detained:

> Section 3142(g) specifies the various factors that must be considered in determining whether there are conditions of release that will reasonably assure the appearance of the person and the safety of the community. Title 18, United States Code, Section 3142(g). These factors are: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. Id.; [United States v.] Motamedi, 767 F.2d at [1403] at 1407 [(9th Cir. 1985)]. Of these factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt. *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985);

*United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

A person facing trial is entitled to release under the least restrictive conditions or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(c); *Motamedi*, 767 F.2d at

1405. Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor. *Id.* at 1403, 1405.

In certain cases, however, the government may move for detention. As the Supreme Court has stated, "The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987) (citing 18 U.S.C. § 3142(f)). The government bears the burden of showing that the defendant poses a flight risk by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406-07.

The weight of the evidence is the least important of these factors. *Id.* at 1408. However, the nature of the offense and the evidence of guilt is relevant "in terms of the likelihood that the person will fail to appear or will pose a danger to the community." *United States v. Cardenas*, 784 F.2d 937, 939 (9th Cir. 1986) (citing *Motamedi*, 767 F.2d at 1408). The legislative history to the Release and Detention Statute (18 U.S.C. § 3142(e)) states that the language regarding the safety of the community "refers to the danger that the defendant might engage in criminal activity to the detriment of the community." S. Rep. No. 98-225, at 12 (1984) *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195. The legislative history also states that the concept of "safety be given a broader construction than merely danger of harm involving physical violence." S. Rep. No. 98-225, at 12 (1984) *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 (citing *United States v. Provenzano*, 605 F.2d 85, 95-96 (3rd Cir 1979) (under previous statute, "danger" extended to non-physical harms such as corrupting a union)). For example, the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.'' *United States v. Strong*, 775 F.2d 504, 507 (3rd Cir. 1985) (quoting S. Rep. No. 98-225, at 13 (1984) *reprinted in* 1984 U.S.C.C.A.N. 3182, 3196).

D. Argument

Viewing the factors set out above, there are no factors that would reasonably assure the appearance of the defendant and the safety the community. Pretrial services considered the defendant's background and the charged offenses and recommended the defendant's

detention. In making this recommendation, pretrial services relied heavily on three factors: (1) the seriousness of the defendant's offenses, (2) his criminal history, and (3) his recent, abject failure to comply with simple instructions while on probation in a prior case. The defendant is responsible for the straw purchasing and smuggling of hundreds of firearms into Mexico, and only a small handful of those firearms have been recovered. Four of his co-defendants have pled guilty, and all will be first-time felons. The defendant's actions not only placed the Mexican people in severe danger, he has severely damaged the lives of his co-conspirators by involving them in this conspiracy. As for the other two factors, pretrial services stated the following in its June 5 report regarding the defendant's performance on probation in his prior felony at the state level, quoting the defendant's probation officer in that case.

> [T]he defendant "displayed poor motivation to complete probation successfully," noting that although he maintained employment and "managed to avoid any new criminal charges," he "continued to fail to comply with the simplest directives of probation." [The probation officer] goes on to note that [the defendant] "consistently failed to submit to drug and alcohol testing, failed to abide by curfew, and failed to engage in an education program as directed by Adult Probation. Furthermore, the defendant failed to obtain approval from the Court prior to leaving the country and left the country for a total of 59 times" from 2020 to 2022.

At the hearing on the defendant's motion for release, Magistrate Judge Macdonald recognized the problems with this portion of the report and admonished the defendant regarding his past failures but indicated he would take a chance on the defendant. The government respectfully disagrees – the defendant is a significant flight risk because of these issues while he was on probation, not to mention the fact that he committed the alleged offenses while on probation. For all these reasons, the Court should order the defendant detained pending trial.

/ / /

Respectfully submitted this 9th day of June, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

s/Matthew C. Cassell

MATTHEW C. CASSELL
Assistant U.S. Attorney

Copy of the foregoing served electronically or by other means this 9th day of June, 2023, to:

Christopher L. Scileppi, Esq.
Lukas Johnson, U.S. Pretrial Services